**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA** :
:
**v.** : **Case No. 22-cr-230**
:
**BRIAN JACKSON and** :
:
**ADAM JACKSON,** :
:
**Defendants.** :

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR RECONSIDERATION OF THE DETENTION ORDER**

On August 2, 2022, the defendant, Adam Jackson, filed a motion to revoke detention order, Dkt. 21, requesting release following the June 9, 2022 detention order issued by U.S. Magistrate Judge Andrew M. Edison in the Southern District of Texas. The motion should be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The government incorporates all facts set forth in the Statement of Facts accompanying the Criminal Complaint. *See United States v. Adam Jackson*, Case No. 1:22-mj-127, attached as Ex. 1. In short, Adam Jackson traveled to Washington, D.C. with his brother and a friend, and became part of a violent mob on the Lower West Terrace of the U.S. Capitol building on January 6, 2021. He egged others on to assault law enforcement officers. *See* Ex. 1 at 10-11 ("Are we going in? Let's go . . . What are we doing standing here, let's go!"). He hurled a large object at a line of police officers defending the building. Jackson didn't stop there, and proceeded to immediately rush the same line of officers with a police riot shield, succeeding in knocking down at least one officer.

On June 7, 2022, Adam Jackson was arrested pursuant to a Criminal Complaint signed by U.S. Magistrate Judge Zia M. Faruqui on June 2, 2022. He was charged with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and (6) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

Upon arrest he was Mirandized, and agreed to waive his rights under Miranda to speak with agents. Although he admitted to some of the basic facts set forth in the Criminal Complaint's Statement of Facts, he did not admit to the conduct underpinning the charges. Jackson provided consent for law enforcement officers to search his phone, and when an agent pointed out that there were no photos from January 4 through 8, 2021, Jackson admitted that he had deleted the photos earlier that same morning. He acknowledged that he had been tipped off to do so by his brother and codefendant's partner, who had called him earlier and told him that his brother had been arrested.

After his arrest, the government moved for detention. The U.S. Probation Office for the Southern District of Texas prepared a Pretrial Report[1] that same day, recommending a number of conditions and a $50,000 unsecured bond as conditions of release to address enumerated risks of nonappearance and danger to the community. The report indicated that Jackson posed a risk of danger for the following reasons: nature of instant offense; prior arrests and convictions;

1 This report will be filed under seal in a separate docket entry.

substance abuse history; pretrial, probation, parole, or supervised release status and compliance; criminal history, violent behavior history; criminal activity while under supervision; history/charge involving violence; history of weapons use; and pattern of similar criminal activity history.

On June 9, 2022, U.S. Magistrate Judge Edison conducted a detention hearing in Houston, Texas, for both Adam Jackson and his codefendant brother. At the detention hearing, the government provided a proffer that relied on the Criminal Complaint and then provided the testimony of FBI Special Agent Craig Storemski. The government admitted two video exhibits at the hearing, one of which was an excerpt from body-worn camera footage, and the other which was a video from open source. Both depicted Adam Jackson on the Lower West Terrace on January 6, assaulting police officers.

Magistrate Judge Edison ordered Jackson detained, finding that he was a danger to the community, and that he was unable to fashion conditions of release that he believed Jackson would abide by. Jackson Det. Hearing Tr. at 96-97 ("I have zero confidence based on the evidence that I have heard, that they will abide by [any] restrictions, given their past history, given the past criminal history where they continue to violate the law . . . There is, in my view, a continuing threat to violence."). He also noted that Adam Jackson had engaged in obstructive conduct by deleting the photos from his phone.

Between Jackson's detention hearing on June 9, 2022 and the instant motion for release, a grand jury indicted Adam Jackson on an initial Indictment, *see* Indictment, Dkt. 8, and then a Superseding Indictment. *See* Superseding Indictment, Dkt. 14. The Superseding Indictment added charges that were absent from the original Criminal Complaint, namely, charges

pertaining to Jackson's use of a dangerous and deadly weapon – the riot shield he used to charge police.  *Id*. (charging violations of 18 U.S.C. § 111(a)(1) and (b) (assaulting officers using a deadly weapon); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon)).

## II.   LEGAL STANDARD

Under the Bail Reform Act, the government may move for detention if a charged offense falls under one of the five enumerated categories within 18 U.S.C. § 3142(f)(1)(A) – (E) or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a juror, as cited within 18 U.S.C. § 3142(f)(2)(A)-(B).  *See also United States v. Chrestman*, 525 F.Supp.3d 14, 21 (D.D.C. 2021).

Under § 3142(f)(1), a charge under 18 U.S.C. §§ 111(a)(1) and (b) is considered a crime of violence.  "Crime of violence" is defined in 18 U.S.C. § 3156(a)(4) in part as "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another or (B) any other offense that is a felony and that, by its nature, involves substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  A charge under 18 U.S.C. § 111(a)(1) and (b) falls within the statute.  Notably, at the time Magistrate Judge Edison ordered Jackson detained, he had not been charged with a crime of violence, yet the judge still found that Jackson was a danger to the community.

The government must prove by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f); *United States v. Munchel*, 991 F.3d 1273, 279-80 (D.C. Cir. 2021).

In determining whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the Court considers the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## III. ARGUMENT

### A. Factors Enumerated in 18 U.S.C. § 3142(g)

#### i. Nature and Circumstances of the Offense

The nature and circumstances of this offense weigh in favor of detention. In *Chrestman*, Chief Judge Beryl Howell articulated a set of factors for evaluating the nature and circumstances of offenses committed at the Capitol, and how those factors bear on detention. 525 F. Supp. 3d 14 at 26-27. Those factors include whether the defendant: (1) is charged with felony offenses, or solely with misdemeanors; (2) engaged in prior planning for his criminal conduct before arriving at the Capitol; (3) carried or used a dangerous weapon at the Capitol; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or *de facto* leadership role with respect to the riot; and (6) injured, attempted to injure, or threatened injury to others; damaged or attempted to damage property; actively threatened or confronted law enforcement officers; or

promoted or celebrated efforts to engage in such conduct.  *Id*.  As this Court noted:

> Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

*Id*.

Adam Jackson is charged with several felonies, including, but not limited to, assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).  He committed more than one act of violence towards officers on January 6, 2021.  He encouraged other people to act, while he was part of a violent mob.

In his motion, Jackson argues first that the allegations of violation in the complaint are "in dispute."  Def't Mtn for Release, Dkt. 21 at 10.  He further asserts that he did not use "any riot shield as an offensive weapon," and that the riot shield is essentially not a deadly or dangerous weapon.  *Id*. at 11.  But videos presented at the June 9, 2022 detention hearing clearly showed Adam Jackson using a large orange projectile and a riot shield as offensive weapons.  First, he hurled the large object straight at the officers in the entryway:



Image 9

*See* Ex. 1 at 8. He then doubled down on his violence by obtaining a police riot shield and charging at the line of police with the shield:


Image 11

Image 12

*Id*. at 9. He bent his head down low for maximum impact, and succeeded in knocking at least one officer down.

There is no doubt that Jackson's conduct on January 6 was serious and violent. His assertion that he "did not swing, pole, hit, smash, or hook any person . . . with a riot shield or

traffic cone," *see* Def't Mtn for Release at 16, is contradicted by the facts.  Not only did he twice attack police officers, first with an orange projectile and second with a riot shield that he aggressively wielded – but he made physical contact with these officers.  Video from Adam Jackson's brother's Facebook account reveals a voice stating that Adam Jackson had even stolen the riot shield from the police.  Jackson himself, in a Facebook message to another person, admitted that he had not brought the shield home.  Ex. 1 at 13.

Evidence from Jackson's Facebook account before January 6 showed that he and his brother had discussed their plans to go to Washington, D.C., and his brother even appeared to indicate a desire to wear black (like the Proud Boys) in order to "blend in" through their clothing that day.  *Id*. at 13.  Both Jackson and his brother wore black on January 6.  Jackson's decision to go to Washington D.C. on January 6 was not a spur-of-the-moment decision.  In addition, not only did he travel with his brother, he also traveled with a third individual – a friend from Texas.  This friend also posted publicly-available photos of Jackson and his brother at the Capitol on January 6, including one of Jackson holding the riot shield:



These messages and photos show that Jackson coordinated and planned with others in advance of January 6.

On the day of January 6, Jackson also acted as a cheerleader, encouraging other rioters to violate the law. The evidence stands in contrast to his assertion that he has "made no attempt to instigate anyone or cause any discord." Def't Mtn at 13. As he stood with the mob outside of the Lower West Terrace, he shared a bottle of what appeared to be alcohol with a young male

wearing braces and appeared to celebrate the riot. At one point, he yelled at others who walked past, "Are we going in? Let's go . . . What are we doing standing here, let's go!!" Ex. 1 at 10. At another point, as he appeared to be getting ready to attack the line of police officers, he yelled toward other rioters, "I don't fucking lose!! I don't fucking lose!!" This evidence directly contradicts his bold assertion that "[t]here was no braggadocio by him before or during the horrible turn where a peaceful protest became a declared riot." Def't Mtn at 17.

In short, Jackson engaged with others in the mob, feeding off of, and feeding others', appetite for violence. Further, his assertions that he "did nothing to breach the Capitol grounds or building," and "entered the grounds behind others, where no signs, barriers, or policeman indicated he should not enter," Def't Mtn at 16, are starkly contradicted by the fact that he stood in front of an entryway to the Capitol building that was defended by a line of police officers, watching other rioters attack, and then himself attacking the line.

**ii. Weight of the Evidence Against the Defendant**

This factor weighs in favor of detention. The video evidence alone against Adam Jackson includes BWC footage and videos taken from the public on January 6, 2021, as well as the videos on his brother's Facebook account. The videos not only depict Jackson conducting the above-described actions but also provide helpful identification of him, in that he is often pictured with his brother. Both Jackson's and his brother's Facebook messages and videos contain admissions that Jackson was at the Capitol on January 6. Someone asked Jackson about his brother's Facebook account being deleted, and indicated that they had been showing people "yalls videos." Ex. 1 at 13. This person said "Looks like you guys were all up in it!," to which Jackson replied, "We were. I'm fucking pissed at what is happening and the things that are

being covered up . . . I'm gonna do my best to get [back] there for [inauguration]." *Id.* And a week after January 6, he also sent around a message in which someone had written, "[W]e are in a full blown Military Operation right now to remove the threats and install our President back in power and control the violence in the big cities." *Id.* at 14.

Other electronic evidence supports the defendant's presence at the Capitol. For example, Jackson's friend's Facebook account contained photos of Jackson at the Capitol on January 6. And airline records show that Jackson flew from Texas to the Washington, DC area around January 6.

**iii. History and Characteristics of the Defendant**

This factor also weighs in favor of detention. Jackson appears to have been a part of his community for the past few years, but his admittedly dated criminal history contains serious and violent conduct.[2] By the age of 18, he had been arrested at least three times for assault. At age 18, in 1997, he was arrested and sentenced to ten years' "deferred probation" for aggravated assault with a deadly weapon. According to a police report from this case, Jackson and his brother were hanging out with friends at a gas station. A complainant drove past, and spotted Jackson, with whom he claimed having an ongoing feud. The complainant stopped at the gas station and exited his vehicle with a baseball bat, heading toward Jackson. Jackson and his friends drove off and went to a nearby apartment complex. Once Jackson got to the apartment building, a witness saw Jackson and his brother exit their car and heading to the building, saying "Let's go get the gun." Jackson and his brother ran out of the apartment building a few minutes

2 The information cited herein relating to Jackson's criminal history draws from the Pretrial Report generated by the U.S. Probation Office for the Southern District of Texas and from a police report obtained from the Harris County Sheriff's Office in Houston, Texas.

later, saying, "We got it, we got it."  Jackson and his brother got back into their car, and eventually drove past the complainant's car.  Jackson hung out of the passenger window with a .22-caliber rifle and shot at the complainant.  Police apparently received a tip that the rifle had been thrown in a nearby pond; police were able to recover the gun in the pond and Jackson was identified in a photo spread by the complainant, the witness, and another individual.

Although he submitted affidavits from other individuals who indicate they were witnesses to this crime, *see* Def't Mtn at Dkt. 21-2 and 21-3, at least one of these affiants admits that Jackson had a gun.  Dkt 21-1 at 2 ("Mr. Jackson fire[d] a warning shot into the air from the passenger window.").

And contrary to his attempts to cabin his criminal history to just the 1997 shooting ("[t]he period of 1997-98 does not define him," Def't Mtn at 18), he was arrested multiple times after that, and as recently as 2009.  In 2002 and 2004, he was arrested for "terroristic threats," and in 2004 and 2006 for nonviolent offenses.  In 2009, Jackson was arrested for assault causing bodily injury.  Although this 2009 assault was dismissed two years later, the note on this case indicated the reason for dismissal was because "[t]he complaining witness could not be located."

As a result, although dated, Jackson has demonstrated a repeated capacity for violent behavior.

More troubling recent behavior includes not only the instant offense, but Jackson's conduct on the day of his arrest.  As he acknowledged after pointed questioning, early in the morning on June 7, 2022, he had deleted evidence from his phone of his presence at the Capitol building on January 6.

**iv. Nature and Seriousness of the Danger Posed by the Defendant's Release**

This factor is the closest call, but it weighs in favor of detention. Although it is true that Jackson has a family and roots in the community, these attachments and support made no difference in his decision to head to Washington, D.C. and commit the instant offense. Even after January 6, it is clear from his Facebook messages that he had no remorse over assaulting police officers while he was there – bragging about the riot shield that he had used to charge officers and encouraging others that they were in a "full blown military operation." Jackson asserts that he did not "threaten or harm any member of his community" in between January 6, 2021 and his arrest in June 2022, and that that is "incontrovertible proof that his release poses no threat to the community." Def't Mtn at 19. Yet on January 6, 2021, he hurled an object at a line of police and then charged at them with a riot shield. These officers were standing guard in an entryway of the Capitol building, and Jackson was present for some time as others assaulted the same line of officers before himself deciding to take part in the violence. His was a deliberate and intentional decision, unprovoked by any actions from the police officers. Any law-abiding conduct that Jackson can point to should not be given undue weight, given his past and recent violent conduct.

While each detention determination is a fact-bound inquiry that must be made individually, *United States v. Khater*, 856 Fed. Appx. 322, 323 (D.C. Cir. July 26, 2021), the D.C. Circuit in *Munchel* notably drew a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness." 991 F.3d at 1284. In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness. *Id.* Other courts in this district have made

the same observation.  *See United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021) ("Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does."). The defendant's actions demonstrated "a willingness to use violence—even against law enforcement—to achieve his political aims" indeed, he "sought out conflict with law enforcement by making his way to the front lines," then took actions that "were intended to injure law enforcement officers."  *United States v. Fitzsimons*, No. 21-cr-158, 21 WL 4355411, at *7 (D.D.C. September 24, 2021).  "Such egregious conduct reflects the depths of his disregard for the safety of others, for our democratic institutions, and for the rule of law."  *Id.* (internal citations omitted).

In short, Jackson poses a danger to the community based on his violent acts at the Capitol, his lack of remorse and obstruction regarding his acts at the Capitol, and his violent criminal history.

## IV. CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court deny Adam Jackson's motion for revocation of the detention order entered in the Southern District of Texas.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:       /s/
CINDY J. CHO
Assistant United States Attorney
NY BAR #4751053
601 D Street NW
Washington, DC 20530
(317) 246-0107
Cindy.Cho@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2022, I caused a copy of the foregoing to be served on counsel of record via electronic filing.

*/s/ Cindy J. Cho*
Cindy J. Cho
Assistant United States Attorney