**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 22-230 (RC) |
| | : | |
| ADAM LEJAY JACKSON, | : | Re Document No.: 21 |
| | : | |
| Defendant. | : | |

**ORDER**

**GRANTING DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

**I. INTRODUCTION**

Defendant Adam Jackson was one of the hundreds of people who stormed the Capitol to stop Congress from certifying the results of the 2020 presidential election. Video footage shows that on January 6, 2021, Jackson was at the front of the crowd facing a line of officers in the tunnel at the Lower West Terrace. Jackson hurled a large red cone at the police line, and then charged at the police line using a police shield in his possession. Jackson was arrested on June 7, 2022. Following a detention hearing before Magistrate Judge Andrew Edison of the U.S. District Court for the Southern District of Texas, Jackson was ordered detained pending trial. Jackson now asks the Court to revoke that detention order and release him. Def.'s Mot. to Revoke Detention Order, ("Def. Mot."), ECF No. 21. For the reasons described below, the Court will grant the motion.

## II.  BACKGROUND[1]

Adam Jackson participated in the storming of the Capitol with his brother (and codefendant) Brian.  Photos from Facebook show that on January 6, 2021, Jackson and his brother attended the "Stop the Steal" rally and later on went to the Capitol building to take part in the riot.  Compl. at 2, ECF No. 1-1.

Multiple videos captured Jackson's activities at the Capitol.  On the Capitol grounds, Jackson can be seen wearing a blue hat with a distinctive flag-like design, a long-sleeved black jacket, and blue jeans.  Gov't Ex. 1.  While among the crowd, Jackson said, "What are we doing standing here, let's go!", and he also passed a bottle of liquor to share, to the delight of those around him.  *Id.* at 00:17–00:41.  Jackson then made his way closer to the tunnel; at this point in time his left hand gripped a police shield and he had a large American flag tied around his neck which formed a cape.  Gov't Ex. 2.  Jackson eventually reached the very front of the crowd, directly facing the line of officers holding the tunnel.  Gov't Ex. 3.  Videos from multiple angles show that Jackson threw a large red cone at the police line, immediately gathered himself behind his police shield, and then charged with the shield directly into the police line.  *See id.* at 00:06–00:12 (crowd's perspective); Gov't Ex. 4 at 00:40–01:18 (officer body camera's perspective); Gov't Ex. 5 at 01:38–01:53 (CCTV's perspective).  The attack appeared to have knocked off his hat and cut his head.  *Id.*; Compl. at 9–10.  After regaining his balance, Jackson backed away into the crowd.  Gov't Ex. 3.  Days later, Jackson sent a Facebook message telling another person that he did not bring the shield home because it "[c]ost too much to ship home."  Compl. at 13.

---

[1] This background is drawn from the government's charging instruments, the parties' briefing, and the exhibits tendered to the Court in support of each party's motion.  It does not represent the Court's findings of fact on the merits of the case.

On June 7, 2022, Jackson was arrested. He was charged with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and (6) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *See* Indictment, ECF No. 8. A superseding indictment followed with additional charges against Jackson. *See* Superseding Indictment, ECF No. 14 (charging violations of 18 U.S.C. § 111(a)(1) and (b) (assaulting officers using a deadly weapon); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon)).

After Jackson's arrest, the government moved for his detention. On June 9, 2022, U.S. Magistrate Judge Edison conducted a detention hearing in Houston, Texas, for both Adam Jackson and his codefendant brother. Gov't Ex. 6. Judge Edison ordered Jackson detained on the basis that he was a danger to the community and that no conditions of release would assure the safety of the community. *Id.* at 96–97. Jackson now moves to revoke this detention order. ECF No. 21. The government opposes his release. ECF No. 23. The Court heard argument on the matter and ordered the parties to submit any additional relevant materials. *See* Min. Entry (Aug. 22, 2022). The parties subsequently submitted exhibits, which are listed in the Appendix attached to this Order. The motion is now ripe for decision.

### III. LEGAL STANDARD

When a magistrate judge detains a person pending trial, "the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The D.C. Circuit has "not squarely decided" what the standard of review should be for such proceedings. *See United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). But every circuit to address the issue has held that a district court's review of a magistrate's detention order is *de novo*. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 23 & n.5 (D.D.C. 2021) (collecting cases). Neither party argues otherwise. Accordingly, the Court will review the detention order *de novo*.

### IV. ANALYSIS

The Bail Reform Act permits the detention of a defendant awaiting trial only in "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). For a defendant to qualify for pretrial detention, his case must "involve[]" an offense that falls into one of five enumerated categories, 18 U.S.C. § 3142(f)(1), or pose a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The court "shall order the detention" of a qualifying defendant if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1). In other words, the court must ask "whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the government only contends that Jackson is a danger to the community.

Jackson is eligible for pretrial detention. One kind of offense that qualifies a defendant for pretrial detention is a crime of violence. 18 U.S.C. § 3142(f)(1)(A). A crime of violence

4

includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 3156(a)(4)(A). Among other offenses, Jackson is charged with assaulting, resisting, or impeding federal officers by using a riot shield in violation of 18 U.S.C. § 111(b). *See* Superseding Indictment (Count 2). Because that offense is "categorically a crime of violence," Jackson is eligible for pretrial detention. *See United States v. Quaglin*, 851 F. App'x 218, 218 (D.C. Cir. 2021); *see also United States v. Klein*, 533 F. Supp. 3d 1, 8–9 (D.D.C. 2021).

The Court must therefore decide whether Jackson should be detained on the basis of dangerousness. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *see also* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."). "To justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Munchel*, 991 F.3d at 1279–80 (quoting 18 U.S.C. § 3142(f)). "Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *Id.* at 1280. The "dangerousness inquiry" is a "forward-looking determination." *United States v. Languerand*, No. 21-cr-353, 2021 WL 3674731, at *4 (D.D.C. Aug. 19, 2021) (quoting *United States v. Hale-Cusanelli*, 3 F. 4th 449, 456 (D.C. Cir. 2021)).

Assessing whether the government has made this showing requires consideration of four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The Court will address each in turn.

### A. Nature and Circumstances of Jackson's Charged Offenses

On the first factor, Chief Judge Howell's six considerations for assessing the relative severity of a Capitol rioter's conduct provide a helpful framework for the Court's analysis. *See Chrestman*, 525 F. Supp. 3d at 26–27. Those considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct," and (6) the nature of the "defendant's words and movements during the riot," including whether he "threatened or confronted federal officials or law enforcement." *Id.* at 26–27. Balancing those considerations, the Court concludes that the nature and circumstances of Jackson's offenses favor detention.

For starters, Jackson's charged offenses are serious—he "has been charged with felonies." Def. Mot. at 15. Video footage shows Jackson assaulted officers by launching a large red cone at the police line, followed by ramming a police shield directly into the officers. *See* Gov't Ex. 3 at 00:06–00:12 (crowd's perspective); Gov't Ex. 4 at 00:40–01:18 (officer body camera's perspective); Gov't Ex. 5 at 01:38–01:53 (CCTV's perspective). Jackson attempts to downplay the significance of the weapons he used. He claims that cone was "small" and

6

"pliable." Def.'s Reply to Gov't Response ("Def. Reply") at 6, ECF No. 24. But the videos show otherwise. In a case involving what appears to be the same cone, a judge in this District remarked that the cone was "far from harmless" and "particularly substantial." *Languerand*, 2021 WL 3674731, at *5. In addition, Jackson also made physical contact with the officers by charging at them with a police shield, which appeared to knock at least one officer down and caused Jackson himself to lose balance. *See* Gov't Ex. 3; Gov't Opp'n to Def.'s Mot. ("Opp'n") at 8, ECF No. 23. Jackson argues that a shield "is by its nature a defensive item," but the videos show that he used it offensively as a battering ram. Def. Mot. at 11; *cf. United States v. Richardson*, No. 21-cr-721, 2022 WL 252034, at *8 (D.D.C. Jan. 27, 2022) (January 6 defendant's use of flagpole to strike law enforcement was a "dangerous weapon"). Thus, the offense level (the first *Chrestman* factor) and the weapons Jackson deployed (the third *Chrestman* factor) both favor detention.

      The second and fourth factors, however, weigh in favor of release. Despite the severity of Jackson's actions, it is not clear that they were planned or coordinated. Jackson claims the only plan he made was to peacefully protest on January 6, as evidenced by the fact that he did not bring any weapons or equipment to the Capitol. Def. Mot. at 15. The government claims that Jackson and his brother planned to wear black to "blend in." Opp'n at 9. It is true that Jackson wore a black jacket at the Capitol, but this fact alone (given his blue jeans and plain clothing) does not rise to the level of specific planning and coordination. *Cf. United States v. Gieswein*, No. 21-cr-24, 2021 WL 3168148, at *10 (D.D.C. July 27, 2021) ("[Defendant's] decision to arrive at the Capitol on January 6, 2021 wearing specialized gear and carrying weapons 'suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic

7

process.'" (citation omitted)), *aff'd*, No. 21-3052, 2021 WL 5263635 (D.C. Cir. Oct. 19, 2021); *United States v. Brown*, No. 21-cr-565, 2021 WL 4033079, at *4 (D.D.C. Sept. 3, 2021) (defendant's membership in group committed to traveling to Washington, D.C. "ready and willing to fight" suggests some level of planning and coordination), *aff'd*, No. 21-3063, 2021 WL 5537705 (D.C. Cir. Nov. 17, 2021).

The fifth factor, whether Jackson assumed a leadership role, is a close call but weighs in favor of release. To be sure, Jackson encouraged others to not just "stand" but "go," and he himself set an example by being on the front lines and assaulting officers. Gov't Ex. 1 at 00:17–00:41. But viewed "in the context of that afternoon," Jackson's actions likely did not rise to the level of *de facto* leadership. *United States v. Fitzsimons*, No. 21-CR-158, 2021 WL 4355411, at *4 (D.D.C. Sept. 24, 2021), *aff'd*, No. 21-3069, 2021 WL 6102443 (D.C. Cir. Dec. 17, 2021); *see also United States v. Gieswein*, No. 21-cr-24, 2021 WL 3168148, at *11 (D.D.C. July 27, 2021) ("[Defendant] does appear to encourage other rioters to act, but viewed in context, such actions do not establish that he was a formal or de facto leader of the mob."), *aff'd*, No. 21-3052, 2021 WL 5263635 (D.C. Cir. Oct. 19, 2021)

Finally, the sixth *Chrestman* factor weighs in favor of detention. Jackson's words and movements show that he was not just a bystander or spectator. The D.C. Circuit has stated that "those who actually assaulted police officers and broke through windows, doors, and barricades . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284. Jackson is plainly in the former category. Thus, considering the *Chrestman* factors as a whole, the Court finds that the nature and circumstances of Jackson's charged offenses weighs in favor of detention.

### B. The Weight of the Evidence Against Jackson

Moving to the next § 3142 factor, the weight of the evidence against Jackson also favors detention. As described above, multiple videos captured Jackson's movements and words from several angles. Helpfully for the government, Jackson wore a hat with a distinctive design and also an American flag as a cape, thus making him identifiable in the crowd. *Cf. Languerand*, 2021 WL 3674731, at *1 n.3 (D.D.C. Aug. 19, 2021) (defendant's clothing made him identifiable). Thus, this factor weighs in favor of detention too.

### C. Jackson's Personal History and Characteristics

Unlike the first two § 3142 factors, this factor weighs strongly in favor of release. When evaluating a defendant's personal history and characteristics, a court should take into account the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Here, Jackson is "a father of six, happily married, and gainfully employed." Def. Mot. at 18. He has "deep ties to his family and community where he has lived for over 26 years." *Id.* at 11. As evidence of these ties, over fifty individuals—family, neighbors, friends, and his business partner—wrote letters in support of his release. *See* Ex. 1 to Def.'s Mot. ("Letters"), ECF No. 21-1. In 2021, Jackson quit his existing job to start a small generator business to help families who suffered power losses from hurricanes in the Houston area. Gov't Ex. 7 at 3; Def. Mot. at 3; *see, e.g.*, Letters at 2, 7. Jackson also experienced substance abuse as a young adult but entered a treatment program and has been clean since 2005. Def. Mot. at 12.

The government does not dispute any of Jackson's positive characteristics. Instead, it draws attention to Jackson's criminal history as evidence that he has "demonstrated a repeated capacity for violent behavior." Opp'n at 13. True, January 6 was not the first time Jackson was involved with law enforcement. Jackson committed several misdemeanors when he was a teenager, although he was also charged with assault in 2009 (but that was later dismissed). Gov't Ex. 7 at 5–7. The government admits that Jackson's criminal history is "dated," *id.*, and that Jackson has "no prior felony conviction," Def. Reply at 7. Still, the government claims Jackson is dangerous, and it relies heavily on an incident that occurred in 1997, when Jackson was 18. It claims that Jackson committed aggravated assault with a deadly weapon; Jackson claims that he fired a warning shot in the air in self-defense to stop a deadly assault against himself. Opp'n at 12–13; Reply at 8. Of relevance here is that Jackson was ultimately given ten years deferred probation, which he successfully completed. Opp'n at 12. Thus, despite having some criminal history decades in the past, Jackson's more recent history and deep community ties strongly favor release.

### D. The Nature and Seriousness of the Danger Jackson's Release Poses

The final factor in assessing dangerousness also strongly supports release. Assessing the "'nature and seriousness of the danger . . . posed by the defendant's release' . . . 'encompasses much of the analysis set forth above, but it is broader in scope,' requiring an 'open-ended assessment of the seriousness of the risk to public safety.'" *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (first quoting 18 U.S.C. § 3142(g)(4); and then quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will

reasonably assure . . . the safety of any other person and the community,' it bears heavily on the Court's analysis." *Id.* (quoting 18 U.S.C. § 3142(e)).

This is a close case. On the one hand, Jackson is charged with serious offenses including assaulting police officers, and the evidence against him is strong. On the other hand, Jackson has exceptionally strong ties to his community and positive personal characteristics. Ultimately, the Court is persuaded that release is proper because an additional consideration tips the scales in favor of release: the timing of Jackson's arrest and detention.

Jackson has emphasized that he is not an ongoing threat to the community because of his exemplary record in the time period between January 6, 2021 and his arrest. Indeed, Jackson was only arrested *this* summer—he "lived freely at home in Texas" for seventeen months between January 6, 2021 and the time of his arrest. Def. Mot. at 5. This significant gap in time undermines the government's insistence that Jackson poses a danger to the community. At the hearing, the government could not explain why it took seventeen months to arrest Jackson. It does not appear that the delay was for lack of probable cause, because FBI records show that as early as August 2021, the FBI had located a video showing Jackson "throwing a large object at Capitol Police as well [as] rushing them." Def. Ex. 3; *cf. Languerand*, 2021 WL 3674731, at *1 (January 6 defendant who also threw large cone at officers in same tunnel was arrested in April 2021). It is odd that the government waited over a year to detain someone it claims is dangerous—unless, perhaps, that is not the case.

Equally revealing is Jackson's good behavior in the seventeen-month period that he remained in his community. Jackson represents—and the government does not contest—that during this time, he "worked, attended his son's football games, spent time with his daughters" and wife, "never returned to Washington, DC," and "never committed a violent act against any

11

person." Def. Mot. at 5. During this period, Jackson also apparently quit his job to start a power business to help his community. Gov't Ex. 7 at 3; Def. Mot. at 3; *see, e.g.*, Letters at 2, 7. Thus, Jackson has affirmatively provided the Court some evidence that he is not a danger to the community.

The Court's decision to release Jackson is also supported by the fact that the government has not sought detention for January 6 defendants who have been charged with similarly assaultive conduct on officers. *See, e.g.*, *United States v. Creek*, No. 21-cr-645 (D.D.C.) (striking and kicking officers); *United States v. Wilson*, No. 21-cr-345 (D.D.C.) (jabbing officers with pipe, pulling shield away from officers, pushing officers to the ground); *United States v. Palmer*, No. 21-cr-328 (D.D.C.) (spraying fire extinguisher at officers and then throwing it at officers twice). In one of these cases, the government even pointed to "defendant's law-abiding conduct after January 6th" as evidence that "conditions can be fashioned to . . . effectively assure the safety of the community." United States' Response to Def.'s Mot. to Revoke, *United States v. Creek*, No. 21-cr-645 (D.D.C.), ECF No. 9. And even when the government has opposed release in cases with similar charges, judges in this District have granted release. *See, e.g.*, *United States v. Miller*, No. 21-cr-75 (D.D.C.), ECF Nos. 14, 22 (defendant charged with assaulting officers with fire extinguisher).

In short, although Jackson's charged offenses are severe, the government has not met its burden "by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Munchel*, 991 F.3d at 1279–80 (quoting 18 U.S.C. § 3142(f)).[2] The Court is not persuaded that if released, Jackson

---

[2] The government also mentions that Jackson "engaged in obstructive conduct by deleting [January 6] photos from his phone." Opp'n at 3. But the Bail Reform Act permits detention on this basis if there is "a serious risk that such person *will* obstruct or attempt to obstruct justice."

12

would "pose[] a concrete, prospective threat to public safety." *Id.* at 1280. Jackson's deep ties to his community, coupled with his law-abiding behavior in the seventeen months prior to his arrest, suggest otherwise. Jackson has volunteered several conditions of his release. Def. Mot. at 20. The Court will order Jackson to be released by adopting some of these conditions and also providing its own conditions, as fully set forth below.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion (ECF No. 21) is **GRANTED**. It is hereby:

**ORDERED** that Defendant be released to the third-party custody of his wife Jamie Jackson pending sentencing. During this period Defendant shall be supervised by the Pretrial Services Agency of the District of Columbia and, as necessary, the courtesy supervision of the United States Probation Office for the Southern District of Texas (PSA/Probation); and it is

**FURTHER ORDERED** that Defendant shall maintain or continue employment and may travel from his home to work and for such other purposes as PSA/Probation approves; and it is

**FURTHER ORDERED** that Defendant shall comply with a curfew and must remain in his home from 9 p.m. to 6 a.m.; and it is

**FURTHER ORDERED** that Defendant shall not travel outside the Southern District of Texas without prior notification of PSA/Probation and may not travel outside the continental U.S. without approval of this Court; and it is

---

18 U.S.C. § 3142(f)(2)(B) (emphasis added). Moreover, many of the January 6 defendants this Court has sentenced have engaged in this same behavior and the government has not sought pretrial detention. The government has not explained how Jackson is at risk of obstructing justice in the future or how deleting photos is relevant to the dangerousness inquiry. Once again, the government's argument is undermined by Jackson's peaceful seventeen months in society.

13

**FURTHER ORDERED** that Defendant shall stay out of the District of Columbia except for Court or PSA/Probation business; and it is

**FURTHER ORDERED** that Defendant shall not possess a firearm, destructive device or other dangerous weapon; and it is

**FURTHER ORDERED** that Defendant shall avoid all contact, direct or indirect, with any person who is or may be a victim or witness in the investigation or prosecution; and it is

**FURTHER ORDERED** that Defendant shall submit to testing for a prohibited substance if required by PSA/Probation and shall not use alcohol excessively, not use or unlawfully possess a narcotic drug or other controlled substances, unless prescribed by a licensed medical practitioner; and it is

**FURTHER ORDERED** that Defendant shall not violate federal, state, or local law while on release and report as soon as possible, to the pretrial services or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops; and it is

**FURTHER ORDERED** that Defendant will be supervised by a type of electronic monitoring device to be determined by PSA/Probation.  Defendant will pay all or part of the cost of location monitoring based upon his ability to pay as determined by the pretrial services or supervising officer.  He is required to properly maintain and charge the monitoring device each day as necessary.  Any attempt to tamper with or mask the device's monitoring capability may result in removal from the program and/or additional criminal charges; and it is

**FURTHER ORDERED** that Defendant shall report for trial when the date for trial has been established.

The Court is to be notified of any violations of this Order.

**SO ORDERED**.

Dated: August 30, 2022                                                           RUDOLPH CONTRERAS
                                                                                 United States District Judge

# APPENDIX

| | Government Exhibits |
|---|---|
| 1 | Video titled "Facebook 0535" |
| 2 | Video titled "Facebook 7602" |
| 3 | Video titled "Open source" |
| 4 | Video titled "BWC" |
| 5 | Video titled "USCP CCTV 0074 – 459" |
| 6 | Hearing Transcript (June 9, 2022) |
| 7 | Pretrial Report (June 7, 2022) |
| 8 | Printout of Detail Report, Harris County Law Enforcement (Aug. 22, 2022) |

| | Defense Exhibits |
|---|---|
| 1 | Extract from Hearing Transcript (June 9, 2022) |
| 2 | Printout of Criminal History, Office of Harris County District Clerk (Aug. 22, 2022) |
| 3 | FBI Record Acknowledgment (Aug. 3, 2021) |
| 4 | Signed Facebook Search Warrant (Aug. 25, 2021) |
| 5 | Excerpt from *United States v. Klein*, 533 F. Supp. 3d 1 (D.D.C. 2021) |
| 6 | Hearing Transcript (June 9, 2022) |
| 7 | Pretrial Report (June 7, 2022) |
| 8 | Complete the Record Email #1 with Attachments (Aug. 23, 2022) |
| 9 | Complete the Record Email #2 with Attachments (Aug. 26, 2022) |