**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-230 (RC)** |
| **ADAM JACKSON,** | |
| **Defendant.** | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Adam Jackson to 41 months of incarceration, at the mid-point of the advisory guideline range of 37 to 46 months, 36 months of supervised release, $2000 in restitution, and the mandatory special assessment of $100.

## I.      INTRODUCTION

The defendant, Adam Jackson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Jackson was a vocal and enthusiastic supporter of the mob violence taking place around him at the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol on January 6th.   He scaled a tall ladder to have a better vantage point to see the enormity of the crowd that had overrun the West Plaza and Lower West Terrace.   From there, he could see rioters attacking the police officers in the Lower West Terrace tunnel.   The more he saw, the more eager he was to take part.   Later, on the steps leading to the tunnel entrance, he hurled a large cone at the officers.   Then, using a stolen police shield, and with a running start, he rammed the frontline officers, causing two of them to fall.   The United States recommends that the Court sentence Jackson to 41 months of incarceration for his violation of 18 U.S.C. § 111(a)(1).   A 41-month sentence reflects the gravity of Jackson's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 61, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

> *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.   *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the

inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.   *See* Image 1 below.[2]



*Image 1 (Lower West Terrace tunnel entrance)*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.

---

[2] "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was hold up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area

continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**B.      Adam Jackson's Role in the January 6, 2021 Attack on the Capitol**

**a.   Adam Jackson's assaultive conduct at the Capitol**

Adam Jackson lives in Katy, Texas.   On January 5, 2021, he traveled from Texas to Washington, D.C., via plane, with his co-defendant brother, Brian Jackson, and a friend. [3]   On the morning of January 6th, Jackson (then 42), his brother, and his friend attended the "Stop the Steal" rally at the Ellipse.   After the rally, the three men went back to their hotel, where they hung out and drank.   Later that afternoon, they went to the Capitol, and arrived at the Peace Circle at about 3:38 PM.

While on the West Plaza of the U.S. Capitol, Jackson and company interacted and socialized with other rioters.   At one point, Jackson enthusiastically stated to several rioters heavily outfitted in tactical military gear who were walking by,

> Are we going in?
> We got your back; let's go.
> Hey, you know what - if one goes, we all go.
> We're waitin' on y'all.
> What are we doing standing here?   Let's go!

*See* Image 2, below (Exhibit 1).

---

[3]   The friend has not been charged with any offense on January 6, 2021.



*Image 2 (Jackson – framed in yellow - making statements to outfitted individual)[4]*

At approximately 4:15 PM, amid a crowd of rioters densely assembled on the Lower West Terrace, Jackson and his friend climbed to the top of a ladder.   *See* Image 3, below.

---

[4]  Image 2 is a screen shot from Exhibit 1, a video made and uploaded to Facebook by Brian Jackson, at 0:18.



*Image 3 (Jackson – framed in yellow- and friend on ladder)*

From that vantage point, Jackson watched the violence taking place at the mouth of the Lower West Terrace tunnel.   He used his cell phone to make a video of what was happening there, often zooming in to focus on the aggressive conduct of the rioters.   *See* Images 4 and 5, below (Exhibit 2).



*Image 4 (Jackson pointing at tunnel, stating, "Look at 'em push!")*[5]

---

[5] Images 4 and 5 are screen shots from Exhibit 2, a video made and uploaded to Facebook by Adam Jackson, at 2:04 and 0:29, respectively.



*Image 5 (Jackson zooming in on the chaos at the LWT tunnel)*

He cheered on the efforts of the rioters to break through the defensive police line in the tunnel.   In

the video, Jackson can be heard exclaiming,

> Let's go.   We gotta go, dude.
>
> We should be pushin' with 'em,   Pushin' that way.
>
> This is our house!
>
> Give 'em all hell!
>
> Push!
>
> We take the house.   Right now, we take it.
>
> Look at 'em pushin'!
>
> Fuck you; we won't do what you tell us!

Let us in!

Look at 'em fight!

Yes!   Fight!

Let us in!

Fuck you; we're not going home!

(Exhibit 2).

The three men then made their way to the vicinity of the LWT tunnel.   At that location, USCP and MPD officers assembled at the mouth of the Lower West Terrace Tunnel were fending off rioters who were attacking and attempting enter the Capitol Building by way of that entrance. By this time, Jackson had obtained possession of a stolen police shield.   *See* Image 6, below.



*Image 6 (Jackson – framed in yellow - holding police shield)*[6]

---

[6]  Image 6 is a photo posted to Facebook by the brothers' friend.

At about 4:57 PM, Jackson assaulted the officers in the tunnel, first by heaving a large, red/orange cone-like object at them, and then by charging at and ramming them with a police riot shield. (Exhibits 3, 4, and 5)   Jackson, who is 6' 2" tall and weighs approximately 200 lbs., took a running start up the top portion of the stairs and slammed into the frontline officers with all the force he could muster.   *See* Images 7, 8, below.



*Image 7 (Jackson ramming the police line with shield)*[7]

---

[7] Images 7 and 8 are screen shots from Exhibit 3 at :35.



*Image 8 (Jackson ramming the police line with shield)*



*Image 9 (Jackson – framed in yellow - drifting back after ramming police line)*[8]

The two frontline officers who bore the brunt of this collision lost their balance and fell to the ground.

*See* Image 10, below (Exhibit 5).   One of these officers, MPD Officer K.H. said that, while he was

on the ground, he felt other rioters pull at and strike his leg.   Other officers scrambled to help them



*Image 10 (two officers on ground after collision with Jackson)*[9]

---

[8] Image 9 is a screen shot from Exhibit 4 at 0:18.
[9] Image 10 is a screen shot from Exhibit 5, the BWC of Officer D.P., at 0:47.

to their feet.   (Exhibit 5).   Jackson's audacious action seemed to have an energizing effect on the rioters in the vicinity, in as much as they appeared reinvigorated in their concerted attack on the officers.   (Exhibit 3, 4).   After the collision, Jackson and company celebrated by gesturing and shouting.[10]   *See* Image 11, below.



*Image 11 (Jackson – framed in yellow - gesturing and shouting)[11]*

**b.   Adam Jackson's post- January 6ᵗʰ statements**

On January 10, 2021, Adam Jackson had the following exchange with another person on Facebook ("Individual-1"):

| | |
|---|---|
| **Individual-1:** | Dude looks like your bro's FB deleted! |
| **Jackson:** | Try Brian Jackson |
| **Individual-1:** | Ah got him. Been showing one of my guys yalls videos. |
| **Individual-1:** | Looks like you guys were all up in it! 😂 😂 |

---

[10]  The hand gesture seen in Image 11 is known to be associated with white power.
[11]  Image 10 is from a publicly available video.

| | |
|---|---|
| **Jackson:** | We were. I'm fucking pissed at what is happening and the things that are being covered up. |
| **Individual-1:** | Yeah bro. Usa is going to hell in a handbag right in front of us! Not even covered up well |
| **Jackson:** | Yup! Sad part is that most people don't wanna see it. |
| **Individual**-1: | Yeah. Its not good. Are you going back for inauguration? |
| **Jackson**: | I'm gonna do my best to get there. Working on it. |
| **Individual**-1: | Did you bring the shield home? |
| **Jackson**: | No, we left them. Cost to much to ship home lol |

Adam and Brian Jackson were arrested in Katy, Texas on June 7, 2022. On that date, Adam Jackson submitted to a custodial interview. He admitted to Task Force officers that he, his brother, and an unnamed friend had been at the Capitol on January 6th. He explained that he had traveled to Washington, D.C., "because of things happening in the country" and because his country "got robbed." When asked about the precise impetus for his trip, he said it was "because Trump put out a tweet asking patriots to come." He said the travel plans had been made quickly and last-minute. When Task Force officers asked him about his interactions at the riot with law enforcement officers, he denied having had any interaction with anyone that presented themselves as law enforcement. He denied having seen anyone assault law enforcement officers. In fact, Jackson denied seeing any fighting at all – just "a lot of pushing back and forth."

When asked about his proximity to the Capitol building, Jackson denied that he got any closer than about 150 feet. He said he would not have been able to hit the building with a rock (from where he was). When Task Force officers asked him if he was familiar with a feature of the Capitol building that looked like a tunnel entrance, Jackson behaved as though he was unaware of what they were talking about.. Task Force officers followed up by showing him a picture of the LWT tunnel from the internet. Upon seeing the photo, Jackson immediately and adamantly stated, "I swear to

you; I didn't go near that! We never got near that. Oh, hell no!"   He claimed that he could not recall ever having seen the tunnel before – except maybe on TV news reports.   Generally, regarding his conduct at the Capitol during the riot, Jackson stated, "We didn't do anything to anybody!   We didn't do anything."   He suggested that the interview would not even be happening but for his brother, Brian, posting "stupid shit" on Facebook.   When specifically asked if he had picked up a police shield from the ground, Jackson, for the first and only time in the interview, said he would prefer not to answer.

Ahead of the interview, Jackson received warning that law enforcement might be coming. During the interview, Jackson admitted that he had received a message from Brian Jackson's wife earlier in the day—shortly after Brian Jackson's arrest—advising him to delete pictures and videos from his phone.   He had heeded this advice and did indeed delete evidence of his assault and other participation in the January 6 attack.   During the interview, however, he told the officers that the photos and videos would still be in the "trash" on his phone and gave them consent to review its contents.   Officers then located videos and photos in the "trash".   Jackson identified himself in photos and videos from the riot on January 6th.

### III.    THE CHARGES AND PLEA AGREEMENT

On July 13, 2022, a grand jury returned a Superseding Indictment charging Jackson with six counts, including Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §111(a)(1) and (b) (Count Two).   (ECF No. 14)   On September 29, 2023, Jackson pleaded guilty to a felony violation of 18 U.S.C. §111(a)(1), a lesser offense of Count Two, pursuant to a written plea agreement.   (ECF No. 60)

### IV.    STATUTORY PENALTIES

Jackson now faces sentencing on one Count of Assaulting, Resisting, or Impeding Certain

Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   As the parties and the Probation Office agree, the Guidelines analysis for this matter are as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| S.O.C. - Use of Dangerous Weapon (U.S.S.G. § 2A2.2(b)(2)(B)) (shield) | + 4 |
| Adjustment – Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 3 |
| **Total Adjusted Offense Level:** | **21** |

*See* Plea Agreement at ¶ 5(A).[12]

The U.S. Probation Officer calculated Jackson's criminal history as Category I, which is not

---

[12] Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level for a Section 111 offense is 10.   But when the assault constituted "aggravated assault," the cross-reference in U.S.S.G. § 2A2.4(c)(1) states that the court should apply U.S.S.G. § 2A2.2.   An aggravated assault includes a "felonious assault that involved…a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon;" or an "intent to commit another felony."   U.S.S.G. § 2A2.2, cmt. n.1. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes.   *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010).   Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another.   *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.")   Jackson assaulted the frontline officers in the Lower West Terrace tunnel by hurling a cone at them and ramming them with a police shield.

disputed.   Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Section 4C1.1 was not considered at the time the parties entered into the plea agreement.[13]   No adjustment under section 4C1.1 applies in this case because Jackson used violence in connection with the offense.   U.S.S.G. § 4C1.1(a)(3).   Accordingly, based on both the Probation Officer's and the parties' calculation of the total adjusted offense level, after acceptance of responsibility, at Level 21, Jackson's advisory Guidelines imprisonment range is 37 to 46 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of at least 41 months.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Jackson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Jackson attacked police officers who were trying to defend the Capitol building.   He contributed to some of the worst violence of the riot at a location where many officers suffered injuries during hours of conflict resembling a medieval melee.   Instead of shying away from such violence, Jackson interjected himself into the fray.   Wearing a flag like a superhero cape, he seized an opportunity to advance toward the tunnel entrance.   He first heaved a large, heavy cone

---

[13] "Violence" was defined by Judge Trevor McFadden as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." He also defined it as "the exertion of any physical force so as to injury or abuse."   *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; see also *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting TNM's definition of violence from Bauer).

at the officers.   Then he brought to bear all his size and strength in an attempt to penetrate the defensive line at the mouth of the tunnel.   The nature and circumstances of Jackson's offense were serious, and fully support the government's recommended sentence of 41 months.

### B.   The History and Characteristics of the Defendant

Jackson has not had any encounters with the criminal justice system in many years.   In light of the nature of the instant offense, however, it is worth noting he has two misdemeanor convictions and one felony conviction for assault from the late 1990's for which he served time in jail.   In addition, he had arrests for terroristic threats in 2002 and 2003, as well as an arrest for assault in 2009 which did not result in convictions.   This prior history – while distant – may be indicative of a propensity for violence.   At the very least, it is worrisome and suggests that the instant offense was not an aberration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a Guidelines sentence.   Jackson's assaultive conduct toward police officers on January 6th showed abject disrespect and disregard for the law.   The officers were simply doing their jobs, defending and protecting the United States Capitol building and the people inside.   Judging from his statements atop the ladder, it appears that Jackson was longing to join the efforts of the mob to gain access to the LWT tunnel – as though he thought it would be fun to be part of the action.   The violence at the tunnel was not in any way fun for the officers involved.   Furthermore, given the amount of force with which he struck the defensive line, Jackson could have seriously injured one of those officers. Indeed, the impact of the collision of the shields was sufficient to cause two of them to fall to the ground.   While on the ground, they were vulnerable and exposed, and could have been pulled into the crowd.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 41 months incarceration.

Jackson did accept responsibility in this case – albeit 15 months after indictment.   He was emotional at the plea hearing, and he has provided a statement of remorse in connection with the pre-sentence investigation.   He did not, however, express any remorse in the days following the riot.   On the contrary, he expressed a desire to *return* to Washington, D.C. for the then-upcoming inauguration.

Nor was Jackson contrite – or even forthright - when interviewed by Agents and Task Force officers.   He was adamant in telling them he had never been near the LWT tunnel, and was otherwise unfamiliar with that location.   He emphatically stated that he and his companions had not done anything at the riot.   In light of the video evidence clearly showing the nature of his conduct, these were outright, bold-faced lies, confidently conveyed.   When advised that it was a crime to lie to a federal agent, he only doubled down on the veracity of his statements.   In doing so, Jackson was gambling that the interviewing agents and officers had no evidence of his presence or conduct on the LWT.   He was wrong.   All of this should give the Court pause as to the reasons for and

---

[14]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

depth of his newfound contrition.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*,

D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."  *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[16]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, several salient differences explain the differing recommendations and sentences.   While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

In *United States v. Ralph Celentano, III*, Case No. 22-cr-186 (TJK), Celentano used his body weight and momentum to make forceful physical contact with MPD officers at the riot.   Celentano, who weighed 240 lbs, and other rioters locked arms and marched straight at police officers, breaking the police line on the West Plaza.   Then he chased and pushed an officer.   He used police shields to ram and push back officers in an effort to penetrate a police line at that same location.   Then, with a running start, and leading with his shoulder, Celentano tackled an unsuspecting USCP officer from behind, sending him flying over a 5-foot-high ledge and landing on other persons below.   He was convicted at a trial during which he lied under oath of Assault in violation of 18 U.S.C. § 111(a)(1), Civil Disorder in violation of 18 U.S.C. § 231(a)(3), along with two misdemeanors. Judge Kelly sentenced him to 78 months of incarceration.   Jackson's engagement with police officers was much more limited, and he accepted responsibility, but there are significant similarities in regard to the nature of the conduct in question.

In *United States v. Vincent Gillespie*, Case No. 22-cr-60 (BAH), Gillespie deliberately maneuvered his way through the crowd of rioters to get to the LWT tunnel.   At that location, he

---

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

twice used a police shield to push and press against officers in the tunnel in an effort to penetrate it. Using both hands, he also grabbed and restrained one officer at the mouth of the tunnel, trying to pull him out and rendering him unable to defend himself from being struck by a crutch wielded by another rioter.   Gillespie also used a shield to strike at officers.   He was convicted at trial during which he lied under oath.   He was sentenced to 68 months of incarceration.   While Jackson did not attempt to restrain an officer, his conduct bears similarities to that of Gillespie, and it also resulted in an officer being rendered vulnerable to assault by other rioters.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[17]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted

---

[17]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

under 18 U.S.C. § 3663(a)(3), that Jackson must pay $2,000 in restitution, which reflects in part the role Jackson played in the riot on January 6.[18]   Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023.   *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Jackson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   *See* PSR ¶ 126.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.    *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

---

[18] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[19]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").   *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Jackson to pay $2,000 in restitution for his conviction.   This amount fairly reflects Jackson's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

---

[19] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 41 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   ___/s/   *David J. Perri*_____
DAVID J. PERRI
WV Bar No. 9219
Assistant United States Attorney (Detailed)
United States Attorney's Office